UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LYDIA POTOMA, | ) | CASE NO.  1:23-cv-01153 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| THE CLEVELAND CLINIC | ) | **MEMORANDUM OPINION** |
| FOUNDATION, *et al.*, | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

Defendants The Cleveland Clinic Foundation ("CCF") and Jerilyn Hagan ("Hagan")

moved this Court for summary judgment.  (Doc. 21.)  Plaintiff Lydia Potoma ("Potoma")

opposed the motion (Doc. 24), and Defendants replied (Doc. 29).  For the reasons that follow,

Defendants' Motion for Summary Judgment is GRANTED.

I.      **BACKGROUND**

        A.      **Factual Background**

        CCF is a healthcare organization headquartered in Cleveland, Ohio.  (Doc. 21-1 at ¶ 4.)

In July 2012, Potoma began working for CCF as a Registered Nurse.  (Doc. 40-1 at 4093.)  In

2019, she completed her graduate program and became an Advanced Practice Registered Nurse

("APRN").  (*Id.* at 4105–06.)  As an APRN, Potoma could see and treat patients but had to work

with a collaborating physician.  (*Id.* at 4121–22; Doc. 21-1 at ¶ 8.)

        In January 2020, Potoma joined the Older Adult Behavior Health ("Geropsych") inpatient

unit as the only APRN.  (Doc. 40-1 at 4141.)  In this role, Hagan, the Manager for the Behavior

Health Advanced Practice Providers, supervised Potoma.  (*Id.* at 4107, 4113; Doc. 35-1 at 2715–

16.)  Though Hagan supervised Potoma, they worked at separate locations.  (Doc. 24 at 805–06.)

Dr. Justin Havemann served as Potoma's collaborating physician in the unit, but was not her direct supervisor.  (Doc. 40-1 at 4122.)  APRNs were expected to meet certain expectations like reporting to work between 8:00 a.m. and 5:00 p.m., following department policies, attending bimonthly "huddles," and working with a multidisciplinary team of social workers, medical providers, nurses, physicians, and therapists.  (Doc. 40-1 at 4153, 4163; Doc. 21-8 at ¶ 3.) APRNs were also expected to complete competencies, receive vaccinations, follow COVID-19 protocols, respond to emails, and complete provider's notes after appointments.  (Doc. 21 at 190.)

Depending on patient needs and other factors like the COVID-19 pandemic, the Geropsych unit treated patients on both an inpatient and outpatient basis.  (Doc. 40-1 at 4134–36; Doc. 35-1 at 2816–18.)  In June 2020, Potoma expanded her practice to include outpatient work. (Doc. 40-1 at 4134.)  Until March 2022, she spent approximately 75% of her time on inpatient work and the remaining 25% on outpatient work.  (*Id.* at 4140.)  If Potoma was absent, administrative assistants rescheduled her outpatient appointments.  (*Id.* at 4217.)

Potoma was diagnosed with postural orthostatic tachycardia syndrome ("POTS").  (Doc. 24 at 804.)  This condition can cause lightheadedness, brain fog, fatigue, difficulty with physical exertion, blurry vision, palpitations, tremors, nausea, and anxiety.  (*Id.*)  In 2019, Potoma was also diagnosed with anxiety.  (*Id.*)  Starting in 2014, Potoma was approved for both intermittent and continuous FMLA leave.  (Doc. 40-1 at 4249; *see, e.g.*, Doc. 40-14.)  When she experienced symptoms of POTS, Potoma's intermittent leave was approved for one to two days a week. (Doc. 24 at 805.)  With respect to diagnosed sleep apnea, she had the option to arrive to work up to 90 minutes late.  (Doc. 25 at ¶ 7.)  If her symptoms took longer to resolve, Potoma could take continuous FMLA leave.  (Doc. 24 at 805.)  She renewed her FMLA paperwork for intermittent

leave annually between 2014 and 2022 and as necessary upon taking continuous leave.  (Doc. 40-1 at 4159; Doc. 25 at ¶ 7.)

CCF's Absence Management Office ("AMO") approved and administered FMLA and short-term disability leave.  (Doc. 36-1 at 3185–86.)  CCF required employees using FMLA leave to "follow established department notice and procedural requirements to provide notification of an absence or lateness related to an approved FMLA leave."  (Doc. 35-5 at 3022.)  During her employment, Potoma took FMLA leave several times.  (Doc. 40-1 at 4208.)  According to Potoma, because Hagan did not work in the same hospital and "played no role in ensuring that Potoma's patients on the inpatient unit were covered in the event of her absence," CCF's policy did not require her to inform Hagan of her absences.  (Doc. 24 at 806; Doc. 40-1 at 4217.)  Instead, Potoma understood the department's policy required her to notify the administrative assistant at the hospital where she worked.  The administrative assistant would enter her absence into Kronos, a timekeeping system CCF used to track FMLA.  (Doc. 40-1 at 4217.)  Potoma would also notify Dr. Havemann, and Dr. Ryan Rajaram, another physician who also covered her patients.  (Doc. 24 at 806.)  Hagan testified she, rather than an administrative assistant, was responsible for entering and coding absences in Kronos.  (Doc. 40-9 at 4569; Doc. 35-1 at 2783.)  According to Hagan, the department's policy required employees to inform her of any absences without necessarily disclosing the underlying conditions or details of FMLA leave.  (Doc. 35-1 at 2798, 2813; Doc. 40-20 at 4608; Doc. 36-1 at 3186.)

In May 2020, Hagan communicated the absence policy to the nurses and physician assistants she supervised:

> In light of everything that is going on, I thought it would be a good idea to review the CALL OFF policy.
>
> - Please call 216.636.1925 as soon as you know you will not be in. This is available 24.x7. This team will contact your first two scheduled patients.

- Contact your administrative assistant and/or front-desk team

(Doc. 35-13.)  This policy was reiterated in December 2021.  (Doc. 35-39.)

Between October 2020 and December 2021, Potoma took a series of continuous FMLA leaves.  The first leave period was October 8–18, 2020.  (Doc. 40-14.)  The second leave period was April 28, 2021 to June 17, 2021.  (Doc. 40-15.)  And the third leave period was December 1–19, 2021.  (Doc. 40-17.)  Potoma was also placed on involuntary leave between January 27, 2022 and March 22, 2022.  (Doc. 21-1 at ¶¶ 19–20.)  During this fifteen-month period, Potoma had several encounters with her colleagues and supervisors that form the basis of her retaliation and discrimination claims.

On October 12, 2020, during Potoma's first continuous leave, Hagan emailed Potoma about her failure to respond to emails and calls, copying both Dr. Havemann, and Daniel Karchmer, an administrator, and Hagan's supervisor.  (Doc. 32-3 at 2133.)  Dr. Havemann responded Potoma had been sick.  (Doc. 32-5 at 2136.)  Karchmer warned:

> Failure to communicate at all (including repeated failures to attend required team meetings) after repeated outreach from a direct manager often results in either a welfare check by police at the request of a department or corrective action, or termination.  This has happened with others, so it's not something to be taken lightly.

(*Id.* at 2135.)  Karchmer further stated if Potoma failed to reply, "we can begin big-time corrective action."  (Doc. 32-4 at 2134.)  That day, Potoma responded, detailing her responses to the emails and stating she had not received any calls.  (Doc. 32-3 at 2132–33.)  Potoma explained she mistakenly believed the AMO informed Hagan about her FMLA absences, and told Hagan her "absence may be prolonged."  (Doc. 32-7.)  The police did not perform a welfare check and Potoma was not disciplined for failure to communicate.

On November 12, 2020, Potoma contacted HR to report Hagan harassed her and threatened her with termination and a welfare check.  (Doc. 32-10.)  Potoma spoke to Diane

4

Robinson, an HR Business Partner, about Hagan's inquiries into Potoma's medical conditions and threats.  (Doc. 36-1 at 3215–16.)  Robinson set up a meeting between Potoma and Karchmer.  (*Id.* at 3226.)  Prior to the meeting, Karchmer contacted Potoma, emphasizing the department's policy on attending huddles.  (Doc. 32-2.)  Potoma also testified Karchmer warned her about the tone of her emails and failure to communicate with Hagan could result in termination.  (Doc. 40-1 at 4290.)  At the meeting, Karchmer dismissed Hagan's behavior as "water under the bridge."  (*Id.* at 4289.)  Separately, Robinson warned Hagan about asking for details about employees' FMLA leave.  (Doc. 36-1 at 3233, 3237.)  Moving forward, Hagan copied Robinson on correspondence regarding Potoma's attendance.  (*Id.* at 3240–41.)

In December 2020 or January 2021, Hagan called Potoma and asked about POTS, wanting "to know why POTS caused [Potoma] to take FMLA leave and when [she] would be returning."  (Doc. 25 at ¶ 9.)  Potoma had not disclosed her POTS diagnosis and was not aware how Hagan learned of her diagnosis.  (*Id.*)  In her deposition, Hagan testified Potoma shared her POTS diagnosis with her.  (Doc. 35-1 at 2780–81.)  This conversation prompted Potoma to consult with the AMO about how much information she needed to share with Hagan.  (Doc. 40-1 at 4300.)

On April 22, 2021, Potoma notified Hagan, Dr. Havemann, two administrative assistants, and a social worker she would be out of the office until further notice.  (Doc. 40-12.)  On May 7, 2021, Potoma submitted her application for continuous FMLA leave.  (Doc. 24 at 810.)  In May, Potoma received a professional practice evaluation for the period of January to May 2021.  (Doc. 35-25.)  Her peers rated her as "superior" or "good" in some categories like assessment of patients and completing appropriate documentation.  (*Id.*)  For other categories like "timely, appropriate, and concise communication," "effective as a member of the interdisciplinary

healthcare team," and "physical/mental ability to safely render care," Potoma was rated as "fair" or "poor." (*Id.*) This review also recommended additional monitoring or proctoring to address charts showing Potoma was "prescribing/refiling medications that are outside of a Psychiatric Mental Health[] Nurse Practitioner's scope of practice." (*Id.*) Hagan discussed this comment with Dr. Havemann who clarified he oversaw patients in those cases and "agreed with Potoma's practices." (*See* Doc. 35-1 at 2837–39.) Hagan recommended Potoma's practice be more closely monitored. (*Id.* at 2834.) No further action was taken.

While Potoma was on her second continuous leave, the Geropsych department hired another nurse practitioner, Peter Swauger. (Doc. 40-1 at 4305–06.) According to Dr. Havemann, Vice President Brian Tilow proposed replacing Potoma with Swauger. (Doc. 38-1 at 3679.) Tilow testified Swauger was not hired to replace Potoma, but simply to assist with inpatient care. (Doc. 30-1 at 1490.) Swauger did not stay with the Geropsych unit permanently. (*Id.*) Potoma returned to work in the same position in June 2021.

On August 20, 2021, Potoma was exposed to COVID-19 and left work early. (Doc. 24 at 812.) On August 23, 2021, she emailed Hagan, Dr. Havemann and Dr. Rajaram she would not be at work. (*See* Doc. 30-7; Doc. 30-6.) That day, Dr. Rajaram contacted Hagan and Tilow expressing frustration with Potoma's communication and concerns Potoma had exceeded her authority by instructing another physician, Dr. Molly Do, to cover her patients. (Doc. 30-6.) To Dr. Rajaram, Potoma's poor communication skills are "dangerous and can impact patient care." (*Id.*) Hagan stated, "the chain of command/communication is a chronic issue again[.]" (Doc. 30-7 at 1593.) For his part, Dr. Havemann explained Potoma's contact with Dr. Do and took some responsibility for the miscommunication. (*Id.*) Potoma was not subject to discipline relating to this incident.

6

Later that week, Hagan emailed Robinson about transferring Potoma to a call center/triage role.  (Doc. 30-20 at 1654.)  This role required reviewing patient records and providing guidance to triage patient care.  (Doc. 35-1 at 2854–56; Doc. 31-1 at 1735–36.)  There was no reduction in pay or benefits, but Potoma could choose to work remotely.  (Doc. 31-2.)  Typically, an APRN with Potoma's experience would not work in a triage position.  (Doc. 36-1 at 3264–65.)  According to Potoma, this role would be "less prestigious [and] less challenging."  (Doc. 24 at 813.)  Robinson counseled Hagan to use a two-fold approach that emphasized "the need to care for her patients and giving her the time to care for herself[,] not blaming her taking FMLA which she can use."  (Doc. 30-20 at 1654.)

On August 30, 2021, Dr. Leopoldo Pozuelo, Chair of the Psychiatry and Psychology Department, met with Potoma and gave her a letter stating she was being "temporarily transferr[ed] [] to the Triage position with the Behavior Health Center."  (Doc. 31-2.)  The letter explicitly referenced Potoma's "need to take intermittent leave" and stated it was "starting to affect patient care, disrupting inpatient service and requiring the canceling of numerous outpatient appointments."  (*Id.*)

Following the meeting, Potoma contacted CCF's human resources and legal departments about the transfer.  (Doc. 31-6.)  She accused Dr. Pozuelo, Robinson, and Hagan of retaliation for her use of FMLA leave.  (Doc. 35-1 at 2862; Doc. 31-1 at 1814–15; Doc. 36-1 at 3320.)  Ultimately, Dr. Pozuelo and Robinson concluded they "had no documentation [] to confirm the amount of time [Potoma] was taking off in Kronos" to support their contention that patient care was being disrupted.  (Doc. 36-1 at 3271; Doc. 31-1 at 1746–48.)  Together, Dr. Pozuelo, Robinson, Hagan, and Potoma agreed the transfer would not occur.  (*See* Doc. 36-1 at 3271.)

On September 17, 2021, Tilow, Dr. Rajaram, a manager, and others met to "understand

what is currently happening with the providers on this unit and how each of them interface with the multidisciplinary team." (Doc. 30-8.) Neither Potoma nor Dr. Havemann were present. (*Id.*) At this meeting, the group listed expectations regarding working with the multidisciplinary team, daily documentation of Potoma's attendance, timing for calling out, and establishing the unit's leadership. (*Id.*) Tilow's summary also included a number of negative comments about Potoma's performance, including her relationships with social workers and other nurses and coverage issues. (*Id.*) After this meeting, Karen Hogan, the Director of Behavioral Health Sciences, who worked at the same hospital as Potoma, started sending daily attendance reports. (*See* Doc. 30-10.)

On September 28, 2021, Tilow and Dr. Rajaram met with Potoma. (Doc. 30-21.) Tilow's summary again included a number of negative comments on Potoma's performance, including her failure to work with the interdisciplinary team, arrival to work between 10:00–10:30 a.m., and lack of communication. (*Id.*) Tilow concluded with "the caregivers are in a hard spot with not knowing the FMLA restrictions. At the end of the day, we are to take care of patients in a world class way. We are clearly underperforming." (*Id.*) On October 14, 2021, Potoma contacted Tilow to inform him she intended to resign. (Doc. 30-24 at 1666.)

In November 2021, Potoma called Hogan, expressing she believed CCF had become a hostile work environment and was considering taking legal action. (Doc. 30-11.) Later that month, Potoma took a scheduled vacation from November 22, 2021, to November 26, 2021. (Doc. 30-12 at 1623.) She then took a third continuous FMLA leave from December 1, 2021, to December 19, 2021. (Doc. 40-17.) During this absence, Potoma sent daily emails to Hagan and Dr. Havemann regarding her attendance. (Doc. 33-9.)

On December 3, 2021, Potoma emailed Robinson, Hagan, Dr. Pozuelo, Tilow, and

others, complaining of disability discrimination.  (Doc. 40-19.)  She felt she was "being treated differently because of [her] disability and for taking FMLA leave."  (*Id.*)  Besides summarizing the events above, Potoma complained she was told it "must be nice to have the luxury of taking FMLA."  (*Id.*)  She also stated Tilow threatened her with demotion at a meeting on September 19, 2021, imposed an official report time, expanded list of people to notify about FMLA leave, and commented colleagues may hold a grudge against her for her absences.  (*Id.*)  Potoma also shared she suffered a medical emergency that day, and felt the expectation to contact her supervisor during that time was unfair.  (*Id.*)  According to Potoma, CCF was mischaracterizing and therefore "wasting" her FMLA benefits, and she requested her leave be treated as intermittent, rather than continuous.  (*Id*.)  She concluded by stating she "enjoy[s] working with the Cleveland Clinic and [] like[s] the work."  (*Id.*)

Early on December 15, 2021, Potoma sent an email stating she would be out of the office on December 14, 2021.  (Doc. 40-27.)  She asserted the date in her email was a typo.  (Doc. 24 at 818.)  To Defendants, Potoma communicating her absence "after the majority or entirety of the workday had passed" "was not out of character."  (Doc. 21 at 192.)  Cathie Patrick, an administrative assistant, did not interpret the email to mean Potoma would be absent on December 15, 2021, and did not reschedule that day's patients.  (Doc. 34-1 at 2566–68.)

The predictable happened.  One of Potoma's patients arrived for their appointment on December 15, 2021, and she was not present to see them.  (Doc. 34-3.)  After realizing Potoma was not present, Patrick cancelled Potoma's remaining patients for the day.  (Doc. 34-16.)  Later that day, Dr. Rajaram emailed Hagan, Tilow, Dr. Pozuelo, and others with the subject line "the ongoing issues with LP."  (Doc. 40-26.)  Dr. Rajaram noted Potoma was on her fourth week of leave and stated "[n]o one received any notification that Lydia would be away today."  (*Id.*)  Dr.

Rajaram concluded "Lydia is not fit to see patients.  I do not believe she should be allowed to see patients."  (*Id.* (emphasis omitted).)  Potoma was not disciplined for this incident.

Potoma returned to work on December 20, 2021.  (Doc. 24 at 820.)  On December 23, 2021, Dr. Havemann discovered a Critical Lab Report from December 9, 2021 that had not been properly addressed.  (*Id.*)  Dr. Havemann believed Patrick mishandled this report in a deliberate attempt to undermine Potoma.  (*Id.* at 821.)

In November 2021, the Center for Medicare and Medicaid Services issued a rule requiring employers like CCF to mandate COVID-19 vaccinations.  (Doc. 21-1 at ¶ 14.)  CCF required employees to be vaccinated by January 27, 2022.  (*Id.* at ¶ 15.)  Potoma requested an extension of time to receive the vaccination.  (Doc. 40-22.)  In January 2022, her request was denied.  (Doc. 21-1 at ¶ 18.)  Potoma took an unpaid leave of absence starting January 27, 2022.  (Doc. 24 at 821; Doc. 21 at 194.)  On March 21, 2022, Potoma submitted a religious exemption for the COVID-19 vaccine, which was granted.  (Doc. 40-25.)  She returned to work on March 23, 2022.  (Doc. 24 at 821; Doc. 21 at 194.)

Upon her return, Potoma met with Hagan to review expectations and discuss changes to the unit.  (Doc. 30-18.)  At this time, Hagan informed Potoma she would perform solely outpatient work.  (*Id.*)  According to Defendants, the unit implemented this change because Dr. Havemann and Dr. Rajaram left the unit, leaving no physicians with whom Potoma could collaborate.  (Doc. 24 at 195.)  Potoma felt this role was not a good fit and asked about an open inpatient APRN position advertised on CCF's website.  (Doc. 30-18.)

On March 31, 2022, Potoma submitted a third written complaint to Hagan, Dr. Pozuelo, Tilow, Robinson, and others, detailing harassment and retaliatory conduct.  (Doc. 30-3.)  Potoma felt the meeting she had upon her return to work and the list of expectations was "an attempt to

catch [her] off guard or to require things [] that are not possible in that time frame as a means to justify firing [her] in the future."  (*Id.*)  Potoma also detailed another instance of sabotage by Patrick regarding her schedule.  (*Id.*)  Potoma felt she was "being treated differently based on [her] disability and for taking FMLA."  (*Id.*)

In April 2022, Potoma took leave and called out from work.  (*See* Doc. 35-47.)  That month, CCF considered a "first step of corrective action" for failure to follow the procedures discussed in the March 2022 meeting.  (*Id.*)  CCF did not pursue this measure after determining Potoma called the proper number about her absence, but later than expected.  (*See id.*)

Potoma resigned on May 19, 2022.  (Doc. 24 at 823; Doc. 21 at 198.)  Sometime in 2023, she reapplied to work at CCF as an APRN.  (Doc. 21 at 198.)

### B.     Procedural History

On June 8, 2023, Potoma commenced this action asserting FMLA retaliation against CCF and Jerilyn Hagan (Count 1), disability discrimination in violation of the ADA against CCF (Count Two), disability discrimination in violation of Ohio Rev. Code 4112.02(A) against CCF (Count Three), retaliation in violation of the ADA against CCF (Count Four), and retaliation in violation of Ohio Rev. Code 4112.02(I) against CCF (Count Five).  (Doc. 1.)[1]  Defendants timely moved for summary judgment on all claims.  (Doc. 21.)  Summary judgment is now fully briefed.

## II.    LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).

---

[1] The counts in the complaint are mistakenly numbered in that Count Two is labeled Count Three and so forth.  The Court addressed them here as if properly numbered in sequential order.  (*See* Doc. 1 at 21.)

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of showing that no genuine issues of material fact exist." *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

A "material" fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849–50 (6th Cir. 2020) (additional citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green, Ky.*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted).  "[O]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold*, 369 U.S. 654, 655 (1962); *see also Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005).

A party asserting or disputing a fact must cite evidence in the record or show that the record establishes the absence or the presence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c) and (e).  Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, the Court's role is not to make credibility determinations or "weigh" conflicting evidence. *Payne v. Novartis Phar Corp.*, 767 F.3d 526, 530 (6th Cir. 2014); *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne*, 767 F.3d at 530.

## III.   ANALYSIS

### A.    FMLA Retaliation

The FMLA entitles eligible employees to take up to twelve weeks of unpaid leave in any twelve-month period for qualifying medical or family reasons. *Coulter v. Deloitte Consulting L.L.C.*, 79 Fed. App'x 864, 866 (6th Cir. 2003) (citing 29 U.S.C. § 2612(a)(1)).  An employer may not retaliate against an employee who exercises his or her rights under the FMLA. *Id.* (citing 29 U.S.C. § 2615).

#### 1.    Direct Evidence of FMLA Retaliation

A plaintiff may prove his or her FMLA retaliation claim through direct or indirect evidence and need only prove retaliation through one of those methods. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348–49 (6th Cir. 1997).  "Direct evidence . . . must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [the FMLA], but also that the manager acted on that predisposition." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008) (citation and quotation omitted).

Direct evidence "is that evidence which, if believed requires the conclusion that unlawful

discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999) (citations omitted). "No inferences are required; the illegal animus is 'explicitly expressed.'" *Laws v. HealthSouth N. Ky. Rehab. Hosp. Ltd. P'ship*, 508 Fed. App'x 404, 408 (6th Cir. 2012). In contrast, "[i]f evidence requires the jury to infer a fact, it is not direct evidence." *Anthony v. United Tel. Co. of Ohio*, 277 F.Supp.2d 763, 775 (N.D. Ohio 2002) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994)).

Such evidence is rare. *See Robinson v. Runyon*, 149 F.3d 507, 513 (6th Cir. 1998) ("Rarely will there be direct evidence from the lips of the defendant proclaiming his or her [] animus."). Direct evidence "would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled.'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998); *see also Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 829 (6th Cir. 2000) (supervisor's statements that "he would not promote [plaintiff] to the repair shop manager position because of her sex" and "women are not mechanically inclined" were direct evidence of gender discrimination). In this context, direct evidence of retaliation would be an explicit statement from Defendants that they fired Potoma for exercising her FMLA rights. *See Mitchell v. Madison Dist. Pub. Schs.*, No. 23-cv-10472, 2024 WL 4884412, at *2, 2024 U.S. Dist. LEXIS 214231, at *5 (E.D. Mich. Nov. 25, 2024) (citing *Imwalle v. Reliance Med. Pros., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008)).

Potoma argued she has "direct evidence of retaliatory/discriminatory harassment." (Doc. 24 at 827–28 (citing *Broska v. Henderson*, 70 Fed. App'x 262 (6th Cir. 2003)).) In her opposition, Potoma lists fifteen purported examples of direct evidence of retaliation:

> 1. Hagan's persistent requirement that Potoma contact her every time Potoma used FMLA, even though the established, and pre-existing, call-off policy for

14

Hagan's department did not include that requirement. Furthermore, as substantiated by Robinson, Nurse Practitioners can and do enter their own attendance data into KRONOS, and within Potoma's department at Marymount, the established practice was to have an administrative assistant enter attendance data, including FMLA usage.

2.    Hagan's persistent and intrusive inquiry about Potoma's private health information.

3.    Tilow's suggestion that Potoma should be replaced by Pete Swauger while she was on FMLA, because he wanted someone who would show up to work and take care of patients.

4.    Hagan's explicit attempt to transfer Potoma to a less prestigious, call center role, because Potoma's use of approved FMLA was allegedly disrupting patient care and causing cancellation of appointments.

5.    Hagan's false statements to Pozuelo and Robinson, to justify the transfer, that Potoma had accrued excessive absences.

6.    Tilow convening a meeting to discuss "concerns of Lydia not showing up to work."

7.    Tilow appointing a Director of Nursing to surveil Potoma's attendance, who then also enlists her subordinates to report on Potoma's whereabouts.  Potoma was then informed by a nurse that other nursing staff are discussing her medical conditions and her use of FMLA.

8.    Tilow directly confronting Potoma about how her disabilities (anxiety and POTS) impacted her performance and interaction with the team and imposes new and unique standards that apply only to Potoma, such as calling him and the nurse manager when she will be absent.

9.    Tilow telling Potoma that FMLA is a luxury and she should not be surprised if her coworkers hold a grudge against her for taking FMLA.

10.    Rajaram's wide publication of overblown accusations about the effects of Potoma's absence during an approved leave and defamatory remarks about Potoma's professionalism and ability to serve patients.

11.    Pozuelo thanking Rajaram for his defamatory email instead of disciplining him. (Pozuelo p.158, Ex.96)

12.    Hagan's false statement that she was unaware of Potoma's absence in the face of Rajaram's defamatory statements.

13.    Defendant's refusal to address Cathy Patrick's mishandling of Potoma's appointments.

14.    Hagan's transfer of Potoma to a full-time outpatient role allegedly justified by the fact that, with Haveman[n] gone, Potoma would not have a collaborating physician, yet informing her that Pozuelo would be her collaborating physician for her outpatient practice.

15. Hagan's transfer of Potoma to a full-time outpatient role even though there was a vacant inpatient role posted for which Potoma was qualified.

(Doc. 24 at 827–28.)

These examples are not direct evidence of retaliation because none "contain any explicit expression of unlawful anti-FMLA animus." *See Madison Dist. Pub. Schools*, 2024 WL 4884412, at \*3, 2024 U.S. Dist. LEXIS 214231, at \*5 (citing *Laws*, 508 Fed. App'x at 408). Moreover, each example requires an inference connecting these incidents to Potoma's use of FMLA leave. Because this evidence only inferentially supports Potoma's claim of retaliation, it is not direct evidence of FMLA retaliation. Accordingly, Potoma must proceed under the *McDonnell Douglas* framework that applies when a plaintiff relies on indirect evidence of retaliation.

### 2.    Indirect Evidence of Retaliation

#### a.    The *McDonnell Douglas* Framework

When a plaintiff brings claims of retaliation or discrimination based on indirect evidence, the *McDonell Douglas* burden-shifting test applies. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this tripartite test, the plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. *Id.*; *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981). If done, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 253. Should the defendant carry that burden, the plaintiff must prove that the stated

justification is pretext for discrimination. *Id.* Throughout this entire process, the burden of persuasion remains on the plaintiff to demonstrate intentional discrimination. *Id.*

Because Potoma relies on indirect evidence, the Court applies the *McDonnell Douglas* test to all five of her claims. *See Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017) (holding ADA discrimination claims are analyzed under the *McDonnell Douglas* framework); *see also Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) ("Because Rorrer does not claim to have direct evidence of retaliation, this Court analyzes his claim for ADA retaliation using the *McDonnell–Douglas* burden-shifting approach."); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313–16 (6th Cir. 2001) (applying *McDonnell Douglas* framework to FMLA retaliation claim); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (holding the *McDonnell Douglas* framework applies to Ohio Statutes).

### b.      Elements of FMLA Retaliation

The elements of a prima facie case of FMLA retaliation are: (1) the plaintiff availed herself of a protected right under the FMLA; (2) she suffered an adverse employment action; and (3) a causal connection existed between the exercise of her FMLA rights and the adverse action. *Skrjanc*, 272 F.3d at 314. The parties do not dispute Potoma satisfied the first element of her prima facie case. The parties dispute whether Potoma suffered an adverse employment action and causation. (*See* Doc. 21 at 204.)

### c.      Adverse Action and Constructive Discharge

An adverse employment action is "a materially adverse change in the terms and conditions of a plaintiff's employment." *Spees v. Jame Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (alterations omitted). These actions are "typically marked by a 'significant change in employment status,' including 'hiring, firing, failing to promote, reassignment with significantly

17

different responsibilities, or a decision causing a significant change in benefits.'" *Id.*

Potoma points to two adverse employment actions: constructive discharge and severe or pervasive harassment. (Doc. 24 at 827–30.) Starting with constructive discharge, an adverse employment action occurs when "an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, 578 U.S. 547, 555 (2016). When an employee resigns under such circumstances, the resignation is treated as "tantamount to an actual discharge." *Id.* To show constructive discharge, a plaintiff must prove "that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign" and he must actually resign. *Id.* To establish these components, a plaintiff must show "(1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; and (2) the employer did so with the intention of forcing the employee to quit." *Gobsin v. Jefferson Cnty. Comm'rs.*, 725 Fed. App'x 377, 387-88 (6th Cir. 2018).[2]

"[I]ntolerability is a demanding standard." *Tchankpa v. Ascena Retail Grp.*, 951 F.3d 805, 814 (6th Cir. 2020); *see also Yanick v. Kroger Co. of Mich.*, No. 23-1439, 2024 WL 1856680, at *7, 2024 U.S. App. LEXIS 10563, at *18 (6th Cir. Apr. 29, 2024) ("Intolerability is

---

[2] The Sixth Circuit acknowledged the components of constructive discharge as stated in *Green* "arguably conflict[] with the subjective intent requirement still used by this Circuit." *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 817 n.3 (6th Cir. 2020). To date, the Sixth Circuit has not decided whether *Green* abrogated the Sixth Circuit's test. *Id.* The Sixth Circuit has recently affirmed district court decisions applying the subjective intent requirement. *See Yanick v. Kroger Co. of Mich.*, No. 23-1439, 2024 WL 1856680, at *7, 2024 U.S. App. LEXIS 10563 at *18 (6th Cir. Apr. 29, 2024) (affirming district court's grant of summary judgment on disability discrimination and retaliation claims where the district court "required employees to show their employer deliberately created the intolerable conditions"); *see also Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 373 (6th Cir. 2024) ("Constructive-discharge claims require courts to examine 'both the employer's intent and the employee's objective feelings.'").

a high bar."). Whether a reasonable person would have felt compelled to resign "depends on the facts of each case." *Logan v. Denny's Inc.*, 259 F.3d 558, 559 (6th Cir. 2001). When making this determination, courts consider the factors below "singly or in combination":

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* As the Sixth Circuit's use of "singly" implies, one factor can establish constructive discharge. *See Jemison v. AFIMAC Glob.*, 645 F.Supp.3d 781, 800 (N.D. Ohio 2022) (collecting cases). The parties do not dispute Potoma resigned. Therefore, only the intolerable working conditions are disputed. Of the factors listed above, only the sixth factor appears to apply.[3] To find badgering, harassment or humiliation effectuated a constructive discharge, "it must be pervasive enough to significantly alter the plaintiff's working conditions." *Id.*

Potoma cited her "feeling of helplessness after a year and a half" of "relentless scrutiny, open hostility, threats of discipline, demotion, and termination, direct insults to her professionalism and ability to practice, lack of routine support from administrative staff, and changes in her scope of practice" as support for her constructive discharge. (Doc. 24 at 829.) Potoma also argued she reasonably believed "Defendants were never going to improve her working conditions in response to her concerns." (*Id.* at 830.) Potoma directs the Court to emails detailing incidents with various supervisors and colleagues to support her argument. (*See* Doc. 21 at 195 (summarizing these incidence); *see also* Doc. 40-19; Doc. 40-23; Doc. 40-29.)

---

[3] Plaintiff argued the "scope of her practice" changed when she switched to solely outpatient work. (Doc. 24 at 806.) However, she does not argue this was a "reduction in job responsibilities" or "reassignment to menial or degrading work" such that these factors apply to her constructive discharge claim.

Incidents like reviewing expectations, discussing coverage during Potoma's FMLA leave, and adjusting her workload to meet departmental needs are the type of "subjective discontent" that the Sixth Circuit held was insufficient to show constructive discharge in *Tchankpa*, 951 F.3d at 814. Moreover, negative feedback like Dr. Rajaram's December 15, 2021 email was similarly dismissed in *Tchankpa*. *See id.* ("[C]riticism and negative feedback do not suffice, especially when contained to a few isolated incidents."); *see also Groening v. Glen Lake Cmty. Schs.*, 884 F.3d 626, 631 (6th Cir. 2018) ("[T]his circuit has repeatedly held that an employer's criticism of an employee does not amount to constructive discharge—especially when the employer's criticism is limited to a few isolated incidents[.]"); *Caslin v. Gen. Elec. Co.*, 696 F.2d 45, 46 (6th Cir. 1982) (holding negative feedback that "in no way jeopardized plaintiff's job" did not show constructive discharge even though "it did indicate there was little likelihood of further advancement"). Likewise, Hagan and Tilow's inquiries into Potoma's use of FMLA leave are not intolerable working conditions calculated to encourage resignation. *See Brady v. Potter*, 476 F.Supp.2d, 745, 759 (N.D. Ohio 2007) ("insisting that [the plaintiff] identify the anticipated duration of her requested FMLA leave" "can hardly be construed as intolerable working conditions or as harassment calculated to encourage her resignation").

The parties do not dispute Potoma's working relationships with her colleagues were contentious. (*See* Doc. 40-1 at 4390–91.) However, the emails on which Potoma relies to establish a genuine issue of material fact with respect to badgering, harassment or humiliation are insufficient as a matter of law. Potoma has not shown she was constructively discharged.

Moving to severe or pervasive harassment,[4] Potoma must show the harassment was

---

[4] Severe or pervasive harassment is typically addressed as an adverse employment action in the Title VII context. *See Akers v. Alvey*, 338 F.3d 491, 498 (6th Cir. 2003) (discussing severe and pervasive harassment under Title VII in a sexual and racial discrimination context). At the same

"sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Broska*, 70 Fed. App'x at 269 (quoting *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 21 (1993)).  The conduct must be "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as hostile and abusive."  *Id.*  The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment[.]"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Courts must "consider the totality of circumstances in determining whether the harassment was sufficiently severe and pervasive."  *Strickland v. City of Detroit*, 995 F.3d 495, 506 (6th Cir. 2021).

Two Sixth Circuit cases offer guidance on this point: *Morris v. Oldham County Fiscal Court*, 201 F.3d 784 (6th Cir. 2000) and *Akers v. Alvey*, 338 F.3d 491 (6th Cir. 2003).  In *Morris*, the Sixth Circuit held the plaintiff demonstrated severe or pervasive harassment by showing her supervisor visited her workplace fifteen times and called her thirty times solely to harass her; drove to her workplace multiple times where he sat in his truck and making faces at her; followed her home and gave her "the finger"; destroyed the television she watched at work; and threw roofing nails onto her home driveway several times.  *Morris*, 201 F.3d at 793.  The Sixth Circuit concluded this conduct was "more than simple teasing, offhand comments, and isolated incidents."  *Id.*

In contrast, the Sixth Circuit held the plaintiff in *Akers* had not established severe or pervasive harassment.  There, the plaintiff made a complaint for sexual harassment against her

_____

time, the Sixth Circuit has "often relied on Title VII precent to analyze FMLA retaliation claims."  *Slusher v. United States Postal Serv.*, 731 Fed. App'x 478, 480 n.2 (6th Cir. 2018) (quoting *Hunter v. Valley View Loc. Sch.*, 579 F.3d 688, 691 (6th Cir. 2009)); *see also Bell v. Prefix, Inc.*, 321 Fed. App'x 423, 428 n.2 (6th Cir. 2009) ("We often rely on other employment discrimination law to fill the gaps in our FMLA case law.").

supervisor and was removed from his supervision.  338 F.3d at 499.  Thereafter, the former
supervisor refused to speak to her; instructed employees to ignore her; withheld mail and
memoranda; and criticized her work.  *Id.* at 494, 499.  The Sixth Circuit concluded the post-
complaint activity did not establish severe and pervasive harassment because it was short and
relatively mild.  *Id.* at 499.  The "simple teasing" or "offhand comments" the plaintiff endured
did not meet the standard of egregiousness established in *Morris.*  *Id.*

In *Broska*, which Potoma cited in her opposition, the plaintiff complained of harassment
following a complaint of discrimination.  70 Fed. App'x at 264.  The harassment involved
supervisors reviewing his work more intensely and critically.  *Id.*  The Sixth Circuit noted the
plaintiff did "not claim he was bothered away from work [] or on his breaks," nor that "his
supervisors physically intimidated him or subjected him to verbal abuse."  *Id.* at 270.  The
plaintiff acknowledged that "it was the job of his supervisors to physically inspect his manual
work."  *Id.*  Taken together, the Sixth Circuit found these circumstances were not so hostile and
abusive such that they altered the conditions of employment and dismissed the claim.  *Id.*

The harassment Potoma complained of is more like *Akers* and *Broska* than *Morris.*
Potoma's evidence falls into three general categories: more intense and critical supervision,
offhand comments and isolated incidents, and proposed, but not implemented actions.  To start,
Potoma was required to contact Hagan every time she used FMLA leave, rather than follow the
"established, and pre-existing, call-off policy for Hagan's department."  (Doc. 24 at 827.)
Similarly, Tilow "impose[d] new and unique standards that apply only to Potoma, such as calling
him and the nurse manager when she will be absent."  (*Id.* at 815–16, 827.)  Tilow appointed a
director to surveil Potoma's attendance, but did not do so for other nurses.  (*Id.* at 815, 827.)
These incidents are like the complaints rejected in *Broska*, 70 Fed. App'x at 269–70.  Potoma

has not denied that it was Hagan and Tilow's responsibility to monitor her attendance and ensure coverage for patients. *See id.*; *see also Rinehart v. PNC Bank, N.A.*, 219 F.Supp. 682, 700–01 (S.D. Ohio 2016) (finding no harassment where supervisor's conduct was "requiring [p]laintiff to perform tasks or work times that were within her job duties").

Next, Potoma cited several comments or isolated incidents as evidence of severe or pervasive harassment. She highlighted Tilow's comments about FMLA being a "luxury" and her colleagues holding a grudge against her. Potoma also cited Tilow and Hagan's inquiries into her disabilities' effect on her job performance as evidence of harassment. Tilow's comments are the type of "offhand comments" and "simple teasing" discussed in *Akers*, 338 F.3d at 499. *See also Faragher*, 524 U.S. at 788 (holding the standards of hostility are demanding to "ensure that Title VII does not become a 'general civility code'"). Questions about Potoma's disabilities were isolated incidents, not a regular occurrence. (*See* Doc. 25 at ¶ 9 (discussing a single phone call); *see also* Doc. 40-19 at 4604 (discussing a single conversation).) Potoma has not shown these conversations were outside the bounds of her supervisors' duties. *See Bobnar v. AstraZeneca*, 672 F.Supp.3d 475, 479–80 (N.D. Ohio 2023) (noting that under EEOC guidance, employers may ask questions that are "not likely to elicit information about a disability" like "asking an employee whether he can perform job functions, among other questions").

Last, Potoma argued several threatened actions constitute harassment. First, she cited Tilow's suggestion she be replaced while she was on FMLA leave. (Doc. 24 at 811–12, 827.) Tilow also threatened to demote her in September 2021. (*See* Doc. 40-19 at 4604; Doc. 30-1 at 1491–92.) Next, she highlighted the transfer to a less prestigious or challenging triage role. (*Id.* at 812–14, 827.) Karchmer also threatened Potoma with a "welfare check" by police and termination after Hagan accused her of failing to communicate. (*Id.* at 807–08, 809.) None of

23

these actions were implemented.  Potoma was not replaced.  Tilow did not demote her.  She was

not transferred.  She was not terminated, nor did the police perform a welfare check at her house.

At no point was she disciplined, put on a performance improvement plan, or given a negative

performance evaluation.  These threats or warnings are not severe or pervasive harassment.  *See*

*Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) (finding no adverse employment

action in a threat to transfer positions because "the proposed actions challenged here were never

implemented").

Unlike *Morris*, Potoma has not argued anyone physically intimidated or verbally abused

her.  Potoma likewise has not shown she was "bothered away from work" or on her breaks.

Looking at the totality of the circumstances, she has not shown she was harassed in retaliation

for invoking her FMLA rights.  Instead, Potoma was never denied FMLA leave or formally

disciplined, and she maintained the same position at the same pay with the same benefits.

Potoma has not shown that the conditions of her employment were altered such that she suffered

an adverse employment action.  Accordingly, Potoma has not established this element of her

prima facie case of FMLA retaliation.

### d.      Causal Connection

Even if Potoma was constructively discharged or suffered severe or pervasive

harassment, she has not shown a causal connection between the adverse employment action and

her use of FMLA leave.  A plaintiff can establish causation by "proffer[ing] evidence sufficient

to raise the inference that [the] protected activity was likely the reason for the adverse action."

*Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007).

Potoma addresses causation and pretext together.  (*See* Doc. 24 at 831 (citing *Kirilenko-*

*Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 668 (6th Cir. 2020) ("The same

24

evidence can support both a finding of causation for the plaintiff's prima facie case of retaliation and a finding of pretext.")).)  First, she argued Hagan relied on "false justification" to transfer Potoma to a triage role, and the real motivating factor was Potoma's FMLA leave.  (*Id.*)  Second, Potoma emphasized "disparate treatment between Potoma and her similarly situated co-workers."  (*Id.* (citing *Fischer v. United Parcel Serv., Inc.*, 390 Fed. App'x 465, 468 (6th Cir. 2010)).)  By being asked to adhere to a set schedule, she was treated differently than other APRNs, who could "set their own schedules according to the needs of their patients," allowing them to arrive later or take half-days at their discretion.  (*Id.* at 831–32.)  She also argued Hagan tracked her attendance but did not monitor other nurses in the same manner.  (*Id.* at 832.)

Starting with the transfer to a triage role, Potoma has not proffered evidence sufficient to raise an inference that her FMLA leave was the likely reason.  The letter about the transfer explicitly references Potoma's "need to take intermittent leave" and stated her leave was "starting to affect patient care, disrupting inpatient service and requiring the canceling of numerous outpatient appointments."  (Doc. 30-2.)  However, Dr. Pozuelo testified his motivation was to "better address the patient care gaps" and find a position that was "feasible for Lydia to do in the interim that she could still see patients, take care of them, but not in a position where it would be as disruptive."  (Doc. 31-1 at 1713, 1733.)  Hagan testified the transfer was "to address a need that we had in our department" and they offered the position to other APRNs.  (Doc. 35-1 at 2854; *see* Doc. 31-1 at 1730 (stating the triage position was not created for Potoma).)  Robinson also testified the role "would allow [Potoma] to take better care of herself when she needed time off [] and [] would lessen the disruption with patient care[.]"  (Doc. 36-1 at 3258.)

Once it was clear Potoma did not want to transfer and suspected her FMLA leave played a role in this decision, Dr. Pozuelo, Robinson, Hagan, and Potoma agreed the transfer would not

occur.  At most, this decision shows that once Defendants realized that Potoma's transfer could raise an inference of FMLA retaliation, they abandoned the plan.  Perhaps if Defendants had followed through with the transfer, Potoma could establish a causal connection between the transfer and her intermittent leave.  That said, those are not the facts here.

Next, to be similarly situated in this context, the comparators "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Morton v. Greater Cleveland Reg'l Transit Auth.*, No. 23-3660, 2024 WL 2765835, at *5, 2024 U.S. App. LEXIS 13062, at *16 (6th Cir. May 30, 2024) (quoting *Russell v. Univ. of Toledo*, 537 F.3d 596, 607 (6th Cir. 2008)).  This standard does not require comparators to be "identical in every way" but merely "similarly situated in all relevant respects."  *Id.* (citing *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016)).

Potoma's four comparators are APRNs supervised by Hagan who she claims could deviate from a set schedule: Laura Barbee, Dierdre Raimey, Bankpang Obi-Akatchak, and Laurel Shanley.  (*See* Doc. 24 at 832.)  The record reflects that Obi-Akatchak is not similarly situated in all relevant respects because she was a "consult liaison" who treated patients throughout "the rest of the hospital."  (Doc. 41-at 4309.)  Unlike Potoma, Obi-Akatchak's work was not confined to a specific unit, and Obi-Akatchak's schedule accommodated Dr. Havemann's availability.  (*Id.* at 4310.)  The record also reflects that Barbee was disciplined for failure to communicate her absences or failing to work a full or consistent schedule.  (Doc. 21-8 at ¶ 10.)  Barbee's discipline for similar conduct undermines Potoma's argument of disparate treatment.  If anything, Potoma benefited from *more* flexibility than her peers.

Likewise, Potoma's comparisons to Raimey and Shanley do not establish disparate treatment. According to Potoma's testimony, Laurel Shanley had a mandatory reporting time. (Doc. 40-1 at 4310–11 ("Q: And were you saying that Laurel Shanley doesn't have a mandatory report time? A: Well, she would. She's outpatient.").) Raimey "requested a different schedule due to her family commitments" and coordinated with Hagan regarding her arrival and departure times. (Doc. 21-8 at ¶ 5.) In contrast, Potoma did not request an accommodation, and did not coordinate with Hagan about her schedule. (*Id.* at ¶ 6.) There is insufficient evidence to show disparate treatment in mandatory schedules based on comparisons to other APRNs.

As for the increased monitoring of Potoma's attendance, she has shown that Hagan and Tilow took specific efforts to document her absences in particular. (*See* Doc. 30-21.) Even so, Potoma has not shown that any other APRNs engaged in the same conduct as her: failing to communicate absences, work a full schedule, or attend interdisciplinary huddles. Without this information, the Court cannot find disparate showing causation.

Because Potoma has not shown that she suffered an adverse employment action, or that any action was causally connected to her FMLA rights, the Court need not determine whether CCF has a legitimate nondiscriminatory reason for any action. But, even if she had, her claim would still be subject to summary judgment for the reasons below.

### 3.     Legitimate Nondiscriminatory Reason

Defendants' burden at this stage is to "clearly set forth, through the introduction of admissible evidence, the reasons" for the adverse action. *Burdine*, 450 U.S. at 255. This burden does not require that the employer "persuade the Court that it was actually motivated by the proffered reasons[.]" *Campbell v. Norfolk S. Corp.*, 876 F. Supp. 2d 967, 982 (N.D. Ohio 2012). Rather, the burden is satisfied if Defendants explain what they have done or "'produc[e]

evidence of legitimate nondiscriminatory reasons.'" *Burdine*, 450 U.S. at 256 (quoting *Bd. of Trs. of Keene St. Coll. v. Sweeney*, 439 U.S. 24, 25, n.2 (1978)). Simply stated, Defendants "need not prove a nondiscriminatory reason for [their decision] but need merely to articulate a valid rationale." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996).

Defendants argue Potoma's "refusal to follow the Clinic's FMLA policy, embrace the multidisciplinary model of patient care, communicate regarding her absences, and follow the expectations for APRNs" justified monitoring Potoma's attendance and scrutinizing her performance. (Doc. 29 at 1344.) Hagan's concerns about Potoma's performance and attendance are well documented. (*See* Doc. 21 at 187–88; *see also* Doc. 40-1 at 435; Doc. 35-25 (performance evaluation showing poor and fair marks in certain areas).) Some of Hagan's concerns predated her knowledge that Potoma used FMLA leave. (Doc. 31 at 204–05.) Thus, Defendants have sufficiently stated a nondiscriminatory reason for any adverse employment action Potoma experienced. *See Bashaw v. Majestic Care of Whitehall*, No. 24-3292, 2025 WL 700169, at *5, 2025 U.S. App. LEXIS 5130, at *1 (6th Cir. Mar. 5, 2025) ("Unauthorized absences from work are a valid reason for termination.") (citations omitted); *Imwalle*, 515 F.3d at 546 ("Poor performance is a legitimate, nondiscriminatory reason.").

### 4. Pretext

To prove pretext, the plaintiff may show that the employer's reason for the adverse action either: (a) has no basis in fact, (b) did not actually motivate the employer's actions, or (c) was an insufficient motivator for the employer's actions. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). "Ultimately the plaintiff must produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why'" it took an adverse employment action. *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020) (quoting

28

*Chen v. Down Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

As noted above, Potoma relies on the same evidence to establish both causation and pretext. (*See* Doc. 24 at 831.) Potoma has not shown Defendants lacked support for the few actions they did take to address performance, communication, and attendance issues. A jury could not reasonably reject Defendants' explanation that supervisors discussed Potoma's attendance and communication out of concern for meeting CCF's standards for patient care. As such, Potoma has not shown Defendants' legitimate nondiscriminatory reason was pretextual.

### B.    Disability Retaliation

The ADA provides, in relevant part, that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (quoting 42 U.S.C. § 12112(a)). Ohio's state discrimination laws are similar to the ADA. *See City of Columbus Civ. Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206 (Ohio 1998) ("The federal Americans with Disabilities Act (ADA) is similar to the Ohio handicap discrimination law."). Accordingly, the Sixth Circuit has held "analysis of claims made pursuant to the Americans with Disability Act applies to claims made pursuant to the Ohio Revised Code § 4122.02[.]" *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010). Therefore, the Court will discuss Potoma's ADA and state law claims together for counts two, three, four, and five.

### 1.    Direct Evidence

As with her claim of FMLA retaliation, Potoma argued she has shown direct evidence of disability retaliation. (Doc. 24 at 826–28.) Her arguments in support of her disability retaliation

claim suffer from the same deficiencies as her FMLA retaliation claim. The examples of direct evidence Potoma cites do not reference her disabilities or any activity protected by the ADA. *See Hughes v. Henry Ford Health Sys.*, No. 17-10436, 2018 WL 3956362, at *6, 2018 U.S. Dist. LEXIS 139596, at *17 (E.D. Mich. Aug. 17, 2018) (holding plaintiff lacked direct evidence of disability retaliation where none of the supposed evidence references plaintiff's disabilities). Therefore, Potoma's claim must proceed under the *McDonnell Douglas* burden shifting framework.

### 2. Indirect Evidence

#### a. Prima Facie Case of Disability Retaliation

The elements of a prima facie case for disability retaliation are similar to the elements of an FMLA retaliation claim. Potoma must show: "(1) she engaged in protected activity under the ADA, (2) her employer was aware of that activity, (3) she suffered an adverse employment action, and (4) a 'causal connection' existed between the protected activity and the adverse action." *Williams*, 847 F.3d at 396 (citing *Rorrer*, 743 F.3d at 1046).

The parties do not dispute that Potoma engaged in a protected activity under the ADA and that CCF knew of that activity. As with her FMLA retaliation claim, the parties dispute whether Potoma suffered an adverse employment action and whether that action was causally connected to her ADA rights. (*See* Doc. 29 at 1342.)

#### b. Adverse Employment Action

For the same reasons Potoma failed to demonstrate that she was constructively discharged for her FMLA retaliation claim, Potoma has failed to show she suffered an adverse employment action for her disability retaliation claim. "The ADA does not prohibit all verbal or physical harassment in the workplace" but is instead "directed only at discrimination because of

30

a disability." *Johnson v. City of Mason*, 101 F. Supp. 2d 566, 576–77 (S.D. Ohio 2000) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). When a plaintiff complains of incidents of immature behavior, personality conflicts, and favoritism that are not necessarily related to the plaintiff's disabilities, the Court cannot find constructive discharge to support a claim of disability retaliation. *See id.* Here Potoma has not shown that any of the incidents that purportedly made her work environment intolerable were related to her disabilities. For this reason, and those discussed above, she has not shown that she was constructively discharged or faced any other adverse employment action.

For her claim that severe or pervasive harassment constitutes an adverse employment action, Potoma has not cited an authority that permits the Court to apply language from a Title VII hostile work environment claim to a disability retaliation claim. Instead, the Sixth Circuit has held it has "no license" to import tests from Title VII into the ADA. *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 317 (6th Cir. 2012). Accordingly, the Court will not consider whether Potoma has shown severe or pervasive harassment constituted an adverse employment action for her disability retaliation claim.

### c.      Causal Connection

As with her FMLA retaliation claim, Potoma attempts to show causation through disparate treatment. However, she has not established that the nurses to which she compares herself were not disabled. *See Hoffman v. O'Malley*, 849 Fed. App'x 535, 539 (6th Cir. 2021) (affirming grant of summary judgment of an ADA discrimination claim because the plaintiff "failed to present to the district court evidence on the disability status of any of the employees she alleged were treated more favorably than her"). Potoma has not met her burden with respect to two elements of her prima facie case.

### d.      Legitimate Nondiscriminatory Reason and Pretext

Even if Potoma had carried her burden of establishing a prima facie case, her claim would still fail at the remaining steps of the *McDonnell Douglas* framework.  As with her FMLA retaliation claim, Defendants have shown there was a legitimate nondiscriminatory reason for the actions it took to address Potoma's performance, communication, and attendance issues.  (*See* Doc. 29 at 1344.)  Likewise, she has not shown that a jury could reasonably reject Defendants' concern for patient care as the reason for the limited steps they did take.

### C.      Disability Discrimination

In her opposition, Potoma clarifies her disability discrimination claim is based on a disparate treatment theory.  (Doc. 24 at 825.)  To state a prima facie case of disability discrimination, Potoma must demonstrate: "(1) she has a disability, (2) she is 'otherwise qualified for the position, with or without reasonable accommodation,' (3) she 'suffered an adverse employment decision,' (4) her employer 'knew or had reason to know' of her disability, and (5) she was replaced or her position remained open."  *Williams*, 847 F.3d at 395.  The parties do not dispute that Potoma has a disability, is otherwise qualified for her position, and CCF knew of her disability.  As such, the only elements in dispute are whether Potoma suffered an adverse employment action and whether she was replaced or her position remained open.

### 1.      Adverse Employment Action

As with her FMLA and ADA retaliation claims, Potoma has not shown she suffered an adverse employment action.

### 2.      Replacement

Even if Potoma had suffered an adverse employment action, she has not met her burden with respect to her prima facie case of disability discrimination.  When an employee was not

terminated, a plaintiff can establish the fifth element of his or her prima facie case of disability discrimination by showing "similarly situated non-protected employees were treated more favorably."  *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007).  As discussed with respect to causation and disparate treatment, Potoma's comparisons to other nurses fail to show that they were similarly situated, non-protected, or treated more favorably.

## IV.    CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment (Doc. 21) is GRANTED in its entirety.


**IT IS SO ORDERED.**


Date:  March 28, 2025                                    _____
                                                         BRIDGET MEEHAN BRENNAN
                                                         UNITED STATES DISTRICT JUDGE